947 So.2d 591 (2007)
Jesse DIEGUEZ, Appellant,
v.
DEPT. OF LAW ENFORCEMENT, CRIMINAL JUSTICE STANDARDS AND TRAINING COMMISSION, Appellee.
No. 3D04-1894.
District Court of Appeal of Florida, Third District.
January 3, 2007.
Rehearing Denied February 6, 2007.
Mark J. Berkowitz, Fort Lauderdale, for appellant.
*592 Linton B. Eason, Assistant General Counsel, for appellee.
Before COPE, C.J., and GREEN, J., and SCHWARTZ, Senior Judge.
PER CURIAM.
Jesse Dieguez appeals a final order of the Criminal Justice Standards and Training Commission of the Florida Department of Law Enforcement ("Commission"), which revoked his law enforcement certification. Mr. Dieguez contends that the revocation order is based entirely on inadmissible hearsay and is therefore not supported by legally sufficient evidence. He argues that the evidence against him was not clear and convincing, as is required for a license revocation. We disagree and affirm the revocation order.

I.
Mr. Dieguez was a police officer certified by the Commission, and employed by the City of Sweetwater. The Commission filed an administrative proceeding against Mr. Dieguez, seeking revocation of his law enforcement certificate. The amended administrative complaint alleges that Mr. Dieguez had engaged in lewd and lascivious conduct with a child under the age of sixteen, and had made a false statement about doing so. The Commission alleged that Mr. Dieguez had failed to maintain good moral character as required by section 943.13, Florida Statutes (2002), and requested revocation of his certificate.
The case was referred to an Administrative Law Judge of the Division of Administrative Hearings, who conducted a trial. A combination of hearsay and non-hearsay evidence was received. The Administrative Law Judge entered a recommended order recommending revocation. The Commission accepted the recommendation and revoked Mr. Dieguez' license. This appeal follows.

II.
The victim was a stepdaughter of Mr. Dieguez. In February 2001 she told her mother that Mr. Dieguez had been sexually molesting her over an extended period of time. The mother took the victim to the Miami-Dade County Police Station where she was interviewed by Detective Foote and other officers. One of the things the victim told investigators was that Mr. Dieguez had prepared written contracts between the victim and himself relating to sexual favors.
Several days after the initial contact with the Miami-Dade Police Department, the mother called the detective saying that she had doubts about her daughter's veracity. The detective interviewed the mother and daughter separately. The daughter stated that she had fabricated her allegations.
In May 2001 the contracts mentioned above came to light. A police car previously assigned to Mr. Dieguez was reassigned to Sweetwater Police Officer Lopez. While cleaning out the trunk, Officer Lopez found, concealed under the trunk lining, three documents matching the victim's description of the contracts. Two of the three bore the first names of Mr. Dieguez and the victim, with boxes to check for "yes"signifying agreementor "no" signifying disagreement. The "yes" boxes were checked. One of the three documents was dated December 1996, and the others were undated. The Administrative Law Judge accurately described the documents as being ones which "speak loudly regarding the improper nature of Dieguez' relationship to the victim."
With these documents, the detective interviewed the victim and the mother again. The victim identified the contracts as being the ones she had referred to in her *593 original sworn statement. She withdrew her recantation and stated that the molestation had, in fact, occurred as she had originally said. When the contracts were showed to the mother, the mother confirmed that handwriting was that of Mr. Dieguez.
By the time of the administrative hearing, the victim had reached adulthood. She appeared at the hearing accompanied by her own attorney. The victim again recanted her allegations, maintaining that all of her previous charges against Mr. Dieguez were untrue. The Administrative Law Judge admitted the written contracts into evidence. The court heard testimony from the police officers who had interviewed the victim during the investigation, and Officer Lopez, who found the three contracts.
The Administrative Law Judge concluded that the allegations had been proven by clear and convincing evidence. The findings of fact stated, in part:
6. Dieguez also left a paper trail which, for reasons set forth below, provided clear and convincing evidence of his guilty knowledge of his improper conduct toward the victim.
7. Dieguez created at least three documents which he referred to as "contracts" between himself and the victim. . . .
8. . . . In the context of Dieguez' relationship with the victim and, more significantly, in considering the "contracts" as a whole, it is clear that the contracts were part of an ongoing scheme by Dieguez to induce the victim to continue to submit to him sexually, and to maintain silence about the abuse.
. . . .
13. At the time of the final hearing, the victim, then 19, testified in support of Dieguez, claiming that she had lied to investigators, and to friends, about having been abused by him. By the time of the hearing, the victim had, as one of the investigating officers put it, "flipped twice" as to whether she had in fact been abused by Dieguez.
14. The victim was accompanied to the hearing by an attorney, who entered an appearance on her behalf but made no motions. The victim's mother was also present with Respondent.
15. The trier-of-fact carefully observed the young woman's demeanor under oath and has no hesitation in saying that her purported denial of abuse served instead to corroborate the "contracts" in which Dieguez documents the true and improper nature of his conduct toward the victim.
16. The victim was plainly in distress as she gave her testimony. She claimed, unpersuasively, not to remember details of her allegations, nor of the investigation itself. She claimed not to have spoken with her mother about her allegations against Dieguez at any time after February 15, 2001. In fact, she denied speaking to anybody about the allegations, including the attorney who was present on her behalf.
17. Under all the circumstances, the "contracts" in Dieguez' handwriting affirmatively and compellingly demonstrate the unreliability of the victim's in court denial of abuse.
18. Florida law requires, as a minimum qualification for its law enforcement officers, that they be of good moral character. Florida law further provides that officers who lack good moral character may be stripped of their license to serve in law enforcement. Making a false statement under oath is an independent ground upon which a law enforcement *594 officer's license may be revoked.
Recommended order at 3-6.

III.
Mr. Dieguez contends that all of the factual findings of the Administrative Law Judge were based on inadmissible hearsay, to which he timely objected. He argues that under the Florida Administrative Procedure Act ("APA"), inadmissible hearsay cannot form the basis for a factual finding.
The APA provides that in an administrative trial, "Hearsay evidence may be used for the purpose of supplementing or explaining other evidence, but it shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions." § 120.57(1)(c), Fla. Stat. (2003). See The Florida Bar, Florida Administrative Practice § 4.36 (7th ed. 2004). Under the statute, the evidence which can support a factual finding includes evidence which is not hearsay, and evidence which is admissible under a hearsay exception.[1]
As we interpret the recommended order, the Administrative Law Judge based her findings on the three contracts. For the following reasons, these properly came in as substantive evidence.
The testimony established that the documents were found in a place of concealment under the trunk liner of the police car which had previously been assigned to Mr. Dieguez. This testimony sufficiently supports the conclusion that the documents belonged to Mr. Dieguez. Mr. Dieguez offered no evidence to the contrary.
On examining the text of the documents, all three are in the form of contracts. At the end of two of the contracts are the words "I promise" under which appears Mr. Dieguez' first name and the first name of the victim. Under each name there are "yes" and "no" blocks. The "yes" blocks are checked for Mr. Dieguez and the victim. The third document has the same form but with space for a promise to be made by the victim only.
Because Mr. Dieguez was the party respondent in the proceeding below, the documents were admissible against him as admissions under subsection 90.803(18), Florida Statutes. As defined by the Evidence Code, an admission is a statement that is offered against a party and is (among other things) "(a) The party's own statement in either an individual or a representative capacity; [or] (b) A statement of which the party has manifested an adoption or belief in its truth. . . ." Two of the three documents bear a "yes" mark underneath Mr. Dieguez' first name.
Furthermore, the APA allows hearsay evidence to be used for the purpose of supplementing or explaining other evidence. § 120.57(1)(c), Fla. Stat. In her initial statement to the police, the victim had described these contracts and explained that they were agreements in exchange for sexual favors. She explained that Mr. Dieguez wrote the contracts. The victim's mother also told the detective that the handwriting on the documents was that of Mr. Dieguez. That hearsay evidence is admissible to explain these documents.
Mr. Dieguez contends that the documents could not be admitted into evidence without the testimony of a handwriting expert to identify the handwriting on the documents as being Mr. Dieguez'. We *595 know of no such rule. For the reasons already stated, the documents were properly treated by the Administrative Law Judge as substantive evidence.[2]
With the three contracts having been admitted as substantive evidence, the APA allows hearsay to be used for the purpose of supplementing or explaining them. In her out-of-court statements to the detective, the victim explained that the contracts related to sexual favors, and explained the nature of the relationship between herself and Mr. Dieguez.
Mr. Dieguez argues that the evidence was not clear and convincing. He points out that to revoke a professional license, the proof must be by clear and convincing evidence, and not by a mere preponderance. See Dept. of Banking and Finance v. Osborne Stern and Co., 670 So.2d 932, 933 (Fla.1996).
The clear and convincing standard of proof has been described as follows:
"Clear and convincing evidence" is an intermediate standard of proof, more than the "preponderance of the evidence" standard used in most civil cases, and less than the "beyond a reasonable doubt" standard used in criminal cases. See State v. Graham, 240 So.2d 486 (Fla. 2d DCA 1970). In Slomowitz v. Walker, 429 So.2d 797, 800 (Fla. 4th DCA 1983), the court held that:
Clear and convincing evidence requires that the evidence must be found to be credible; the facts to which the witnesses testify must be precise and explicit and the witnesses must be lacking in confusion as to the facts in issue. The evidence must be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.
Smith v. Dept. of Health and Rehabilitative Services, 522 So.2d 956, 958 (Fla. 1st DCA 1988). The Administrative Law Judge found the evidence in this case to be clear and convincing.
Mr. Dieguez argues that Smith requires us to reverse the Commission's order. In Smith an Administrative Hearing Officer disqualified a food stamp recipient on the ground that the food stamp recipient had intentionally concealed her income. The entire case had been based on documentary evidence. Smith stated that she did not know she had to report nonpermanent part-time work. Id. at 958. The worker who had interviewed Ms. Smith made a nonfraud referral to the agency for adjustment of benefits. Id. As the documentary evidence presented by the agency failed to establish an intentional, as opposed to inadvertent, program violation, the court concluded that the clear and convincing standard of evidence was not met.
The present case is quite different. These documents were found in a place of concealment in Mr. Dieguez' police car. There is no plausible innocent explanation *596 for the text of the documents. The victim's hearsay statements were properly considered by the Administrative Law Judge to supplement and explain the documents. Based on this, the Administrative Law Judge could reasonably find (as she did) that the case had been proven by clear and convincing evidence.
For the stated reasons, the revocation order is affirmed.
NOTES
[1] There is also authority for the proposition that a finding can be supported by hearsay that comes in without objection, but there is authority to the contrary. See The Florida Bar, Florida Administrative Practice § 4.36. For present purposes we need not address that issue.
[2] A handwriting analysis in this case was done by the Crime Laboratory Bureau of the Miami-Dade County Police Department. The handwriting was compared with six Sweetwater Police incident reports which Mr. Dieguez had handwritten during his service as an officer. The Questioned Documents Examiner issued a report stating the examiner's opinion that Mr. Dieguez wrote the three contracts. The Questioned Documents Examiner was scheduled to testify at the administrative trial but, for reasons not clear in the record, failed to appear. While the written opinion of the Questioned Documents Examiner was admitted into evidence over Mr. Dieguez' hearsay objection, there is no indication that the Administrative Law Judge relied on it. That being so, we need not consider whether the hearsay expert report could be considered as evidence which supplements or explains other evidence within the meaning of paragraph 120.57(1)(c), Florida Statutes.